IN THE UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

_____

No. 20-2099
_____

BRIAN DORSEY,
Petitioner

v.

BILL STANGE, Warden, Potosi Correctional Center,
Respondent

_____

**APPLICATION FOR A CERTIFICATE OF APPEALABILITY**
_____

MARSHALL L. DAYAN                  REBECCA WOODMAN
Assistant Federal Public Defender   Rebecca Woodman, Attorney at Law, LC

KIRK J. HENDERSON
Assistant Federal Public Defender

1500 Liberty Center                 1263 West 72nd Terrace
1001 Liberty Avenue                 Kansas City, Missouri 64114
Pittsburgh, PA 15222                (785) 979-3672
(412) 644-6565

IN THE UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT


BRIAN DORSEY,                        )
           Petitioner           )
                       )
                       )
                       )    No. 20-1911
BILL STANGE, Warden, Potosi        )
Correctional Center,                )
                       )
          Respondent           )


## APPLICATION FOR A CERTIFICATE OF APPEALABILITY

Petitioner, Brian Dorsey, through undersigned counsel, respectfully files this Application for a Certificate of Appealability.


I.      **Applicable Standard**

A Certificate of Appealability ("COA") may issue only when the applicant has made "a substantial showing of the denial of a constitutional right." 28 U.S.C. §2253(c)(2); *Tennard v. Dretke*, 542 U.S. 274, 282 (2004)(citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003)). The Supreme Court has interpreted this standard "to require that the 'petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.'" *Id*; *Miller-El*, 537 U.S. at 336 ("[A] petitioner must sho[w] that reasonable jurists could debate whether…the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further."); *Winfield v. Roper*, 460 F.3d 1026, 1040 (8th Cir.2006).

1

## II.  Background.

### A.  Procedural History.

On March 10, 2008, Brian Dorsey entered two pleas of guilty to first-degree murder before the Thirteenth Circuit Court for the State of Missouri.  On August 26, 2008, a capital sentencing hearing commenced with jury selection, and on August 28, 2008, the jury returned a verdict recommending that Mr. Dorsey be sentenced to death.  The sentence was formally imposed on December 1, 2008.

The Supreme of Court Missouri affirmed Mr. Dorsey's death sentences on direct appeal on July 16, 2010.  *State v. Dorsey*, 318 S.W.3d 648 (Mo.2010).  The Supreme Court of the United States denied certiorari on October 6, 2003.  *Dorsey v. Missouri*, 562 U.S. 1067 (2010).

On March 7, 2011, Mr. Dorsey filed an Amended Motion to Vacate, Set Aside, or Correct the Judgment and Sentences pursuant to Mo.S.Ct.R. 29.15, the state post-conviction procedure.  An evidentiary hearing was held in the Circuit Court December 7-9, 2011.  On December 31, 2012, that court denied the motion.  Mr. Dorsey appealed to the Missouri Supreme Court, which affirmed on November 12, 2014.  *Dorsey v. State*, 448 S.W.3d 276 (Mo.2014).

On December 22, 2015, Mr. Dorsey then filed a Petition for Writ of Habeas Corpus under 28 U.S.C. §2254 in the Western District of Missouri, challenging his convictions and death sentences.  Respondents filed an Answer and the state-court record on March 16, 2016.

Thereafter, Mr. Dorsey sought to return to state court in the wake of the Supreme Court's decision in *Hurst v. Florida*, 136 S.Ct. 616 (2016), filing a Motion to Recall the Mandate in the Missouri Supreme Court on February 24, 2017.  That Court ordered the State to respond, which it did on April 1, 2017.  Meanwhile, on March 31, 2017, Mr. Dorsey moved to stay the federal

proceedings and hold them in abeyance pending the outcome of the state court proceedings under *Hurst v. Florida*. The State opposed the motion, but the district court granted it on April 6, 2017.

Litigation proceeded in the Missouri Supreme Court, and on June 27, 2017, that Court denied Mr. Dorsey's *Hurst* claim. *Dorsey v. Griffith*, No. SC96440 (Mo.2017). The Supreme Court denied certiorari on December 4, 2017. *Dorsey v. Griffith*, 138 S.Ct. 512 (2017).

That same date, the district court lifted the stay of the federal habeas proceedings and ordered Mr. Dorsey to file a Traverse, which he did on March 19, 2018. On April 16, 2018, the district court gave the parties notice of a hearing to be held "on the issue of procedural default" on May 4, 2018. The nearly six hour hearing went far beyond procedural default into the merits of the claims without notice to the parties that the merits were to be argued.

On July 26, 2018, the district court entered an order denying as procedurally defaulted Claim 5 of the habeas petition alleging that the State had failed to disclose exculpatory DNA evidence. On September 27, 2019 the district court denied all remaining claims in the petition, denied an evidentiary hearing, denied expansion of the record, and denied a certificate of appealability on any issue.

On October 25, 2019, Mr. Dorsey filed a motion to alter or amend the judgment pursuant to F.R.Civ.P. 59(e). The State responded on November 8, 2019, and the district court denied the motion on May 5, 2020. Mr. Dorsey filed a notice of appeal on June 2, 2020. Mr. Dorsey now files this Application for a Certificate of Appealability.

### B. Brief Summary of Facts of the Offense.

Brian Dorsey had longstanding addictions to crack cocaine and alcohol and suffered from a major depressive disorder. In the days before Christmas 2006, Mr. Dorsey was frantically contacting members of his close-knit extended family, seeking financial assistance to pay drug

dealers whom he owed. On Saturday, December 23, 2006, Mr. Dorsey called his cousin, Sarah Bonnie, desperate to borrow money because his creditors were threatening him. Sarah Bonnie and her husband, Ben, went to Mr. Dorsey's apartment in Jefferson City to try to help him out of a jam. Mr. Dorsey had told his cousin Sarah that a woman to whom he owed money for drugs, Patricia Cannella. and a male friend of hers were at his apartment demanding money. A friend of Sarah and Ben Bonnie, Darin Carel, met them at Mr. Dorsey's apartment. Sarah Bonnie called her sister, Traci Sheley, and Traci also came to the apartment. At some point, they all went inside; it was obvious Mr. Dorsey was strung out on drugs. Cannella wanted the money Mr. Dorsey owed, but the Bonnies responded they could not get her the money that day, but maybe the next day. Cannella and her male associate angrily left. The Bonnies told Mr. Dorsey to get some clothes to spend the weekend with them, and he rode with them to their home. Darin Carel picked up some beer and joined them, as did Sarah's sister and brother in law (and Brian's cousins) Traci and Jon Sheley and their kids.

The men played pool and drank in the detached garage, while Traci joined Sarah in the house. A little later, Sarah's mother (Brian's aunt), Diana Mosier, came by the house, bringing home Sarah's daughter, Jade. Ms. Mosier left, then the Sheleys left, then finally Carel left at around 11:00 p.m.

The next day, December 24, 2006, the Bonnies were supposed to attend a family gathering at Ben Bonnie's parents' home. When they did not show up, family members began calling each other to find out if anyone knew what was going on. Finally, Diana Mosier and her husband Mike agreed to drive to the Bonnies' house, arriving a little after 1:00 p.m. They found the front door open (with the storm door closed), entered the house, and saw Jade sitting on the couch watching television and eating cookies. The Mosiers found the bedroom doors locked, so

Mike found a screwdriver to pop open the lock, entering to find his daughter and son-in-law both shot to death. Sarah Bonnie appeared to have been sexually assaulted.

In the early morning hours of December 26, 2006, Brian Dorsey met his parents after talking to his mother on Sarah Bonnie's cell phone, and asking his parents to go with him to the Sheriff's Department. When they met him at 3:00 a.m, he was standing outside of Sarah Bonnie's car. They spent a few hours together in a motel before they went to the Callaway County Sheriff's Department between 10:00 and 11:00 a.m. Mr. Dorsey was taken into an interview room and advised of his *Miranda* rights. When asked whether it would be fair to say that he was the right person to be talking to about the killings of the Bonnies, Mr. Dorsey said that it would. Mr. Dorsey consented to be searched, and Sarah Bonnie's social security card was found in his pocket. Mr. Dorsey's pant leg had what appeared to be a dark stain on it, and he consented to the seizure of his clothes and to the taking of a buccal DNA swab. After a break, Mr. Dorsey was questioned further and provided additional responses, but shortly thereafter invoked his right to counsel, and officers terminated the interview. Mr. Dorsey was placed under arrest for the murders and put on suicide watch in the Callaway County Jail.

Law enforcement officers began an investigation. One officer interviewed Jade Bonnie, the four year-old toddler daughter of Sarah Bonnie. Jade volunteered she had not heard any loud noises, and in a subsequent interview, said she heard the front door, and her parents' bedroom door, opened, that "they" had come in and killed her parents, and took her "uncle" Beej, her nickname for Mr. Dorsey, with them. She said after her parents were killed, her uncle Beejy came into her room and gave her a hug.

Meanwhile, Sarah Bonnie's car was towed and inventoried. Found inside were two guns, including a .20 gauge shotgun, and numerous items belonging to the Bonnies. Through

interviews, the police discovered Mr. Dorsey had spent the better part of two days running errands for others, including Patricia Cannella, in Ms. Bonnie's car and tried to use the items from the Bonnies to repay a drug debt he owed or to sell items to repay that debt.

A rape kit was performed on Sarah Bonnie's body, and vaginal swabs were taken, establishing through DNA the presumptive presence of semen. Y-chromosomal testing excluded Ben Bonnie and Darin Carel as the source, but did not exclude Mr. Dorsey. There were other potential sources in the state database, but these were not turned over to the defense.

Brian Dorsey was charged with the murders of the Bonnies and related offenses. Chris Slusher and Scott McBride were retained with flat fee contracts by the Missouri State Public Defender. This flat fee – interpreted by Mr. Slusher as the fee "for representation without trial" – resulted in little to no investigation of Mr. Dorsey's case by trial counsel regarding guilt or penalty. Instead, and squarely adverse to Mr. Dorsey's best interests, trial counsel decided to plead Mr. Dorsey guilty and "take their chances" at a penalty trial in front of a jury. Because trial counsel failed to investigate, they failed to discover and present any mitigating evidence of Mr. Dorsey's positive adjustment to prison and his stellar record, including his work record and complete absence of disciplinary violations. Because trial counsel failed to investigate, trial counsel were ignorant of the law on diminished capacity and failed to discover and present, either in defense to the specific element of deliberation or as mitigating evidence at the penalty phase, evidence of Mr. Dorsey's diminished capacity based on his severe and recurrent major depression. In sum, trial counsel fell far short of their constitutional obligations to subject the state's case to meaningful adversarial testing, and failed to provide the requisite assistance of counsel necessary to the fair and reliable proceedings that the Sixth, Eighth, and Fourteenth

Amendments require. A certificate of appealability should issue on the substantial claims presented below.

## III.    Discussion.

### A.    Reasonable Jurists Would Debate Whether Mr. Dorsey's Sixth and Fourteenth Amendment Rights Were Violated by the Failure of Trial Counsel and Post-Conviction Counsel to Investigate and Present Evidence of Mr. Dorsey's Positive Adjustment to Imprisonment.

Mr. Dorsey's trial counsel failed to present evidence to the jury about Mr. Dorsey's stellar record while he was incarcerated. Mr. Dorsey's post-conviction counsel also ineffectively failed to argue trial counsel's ineffectiveness for this failure. Therefore, the claim was procedurally defaulted. The district court held that the trial-counsel ineffectiveness claim was not substantial under *Martinez v. Ryan*, 566 U.S. 1 (2012), and, thus, Mr. Dorsey had not shown cause and prejudice to excuse the failure to exhaust the claim. ECF-104 at 27. The district court's holding that Mr. Dorsey's attorneys were not ineffective for failing to investigate and present evidence of positive adjustment to prison is a finding with which reasonable jurists could – and do – disagree.

The evidence Mr. Dorsey proffered showed that trial counsel neither investigated nor presented mitigating evidence of Mr. Dorsey's history of good institutional behavior prior to his August 2008 sentencing trial. It further claimed that they failed to consult or retain an expert who could have educated the jury about how prisoners like Mr. Dorsey tend to do well in structured institutional settings such as maximum security prisons. ECF-25 at 325-32. The claim sets forth specific facts about Mr. Dorsey's remarkably good behavioral and work records. The allegations included that he had no disciplinary violations while incarcerated at the Callaway County Jail or at South Central Correctional Center. *Id.*at 326. He had a job working in the

kitchen at SCCC. *Id.* While at the Jefferson County Correctional Center, Mr. Dorsey received exemplary notes from correctional staff. *Id.* at 326-327. The Petition asserted that trial counsel could and should have investigated and amassed this evidence, presented it to an expert who could render an opinion on adaptability to incarceration, and presented the evidence and expert testimony to persuade the jury that, based on the objective records and interviews with correctional personnel, there was a strong likelihood Mr. Dorsey would present no risk of future danger in prison and would adapt well to incarceration. As it turned out, such an opinion would have been remarkably prescient, as Mr. Dorsey has a sterling disciplinary record since his incarceration at Potosi Correctional Center. *Id.* at 327-329.

This prison-adaptability evidence is admissible at capital trials. *Skipper v. South Carolina*, 476 U.S. 1 (1986). The district court's first error was holding that *Skipper* is inapplicable because "*Skipper* held that this type of evidence was *admissible*, not that counsel was ineffective for not introducing it." ECF-104 at 27 (emphasis original). Jurists, starting with the Supreme Court, have disagreed with this. *Skipper* recognizes an obligation that counsel must investigate the client's adjustment to prison.

In *Williams v. Taylor*, 529 U.S. 362, 396 (2000), the Supreme Court faulted trial counsel for "fail[ing] to seek prison records recording Williams' commendations for helping to crack a prison drug ring and for returning a guard's missing wallet, or the testimony of prison officials who described Williams as among the inmates 'least likely to act in a violent, dangerous or provocative way.'" Counsel in *Williams* also ineffectively failed to present evidence that Williams "seemed to thrive in a more regimented and structured environment" and that Williams "was proud of the carpentry degree he earned while in prison." *Id.*

Because of this clearly-established law from the Supreme Court, the Third Circuit, for example, found that the petitioner had made a prima facie showing trial counsel was ineffective for failing to put on prison-adjustment evidence. *Wharton v. Vaughn*, 722 Fed.Appx. 268 (3d Cir.)(discussed more fully below), *cert. denied*, 139 S.Ct. 594 (2018). This *ipso facto* means that reasonable jurists find that *Skipper* cannot be discounted as a mere evidentiary ruling, but instead recognize counsel's performance is deficient when failing to find and present this available evidence.

Likewise, courts have noted that the standards recognized in the ABA Guidelines suggest that trial counsel should consider "[e]xpert and lay witnesses along with supporting documentation…to give a favorable opinion as to the client's capacity for rehabilitation, or adaptation to prison."[1] *Johnson v. Bagley*, 544 F.3d 592, 599 (6th Cir.2008)(quoting ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases 10.11(F)(rev.ed.2003) and recognizing the Supreme Court's reliance upon these Guidelines in *Rompilla v. Beard*, 545 U.S. 374, 387 n.7 (2005)).[2]

---

[1] The relevant portion of the ABA Guidelines recognize the standard of practice for counsel to investigate the possibility of prison-adjustment evidence:

> In addition to humanizing the client, counsel should endeavor to show that the alternatives to the death penalty would be adequate punishment. Studies show that "future dangerousness is on the minds of most capital jurors, and is thus 'at issue' in virtually all capital trials," whether or not it is argued by the prosecution or is a statutorily mandated sentencing consideration. Accordingly, counsel should give serious consideration to making an explicit presentation of information on this subject. Evidence that the client has adapted well to prison and has had few disciplinary problems can allay jurors' fears and reinforce other positive mitigating evidence.

ABA Guidelines 10.11, Commentary. Independent of the Guidelines, as noted above, the Supreme Court in *Williams v. Taylor* recognized the necessity of obtaining prison records and presenting prison-adjustment evidence to the jury.

[2] Counsel in *Johnson*, much like Mr. Dorsey's attorneys, presented minimal

Just last month, the Supreme Court underscored that counsel must thoroughly investigate prison-adjustment evidence even in situations when it appears at first blush that the investigation might be fruitless. In *Andrus v. Texas*, 140 S.Ct. 1875 (2020), the defendant's prison record included "verbal threats,…kicking, hitting, and throwing excrement at prison officials when they tried to control him." *Id*. at 1884. Nonetheless, "[h]ad counsel genuinely investigated Andrus' experiences in TYC custody, counsel would have learned that Andrus' behavioral problems there were notably mild" and then "counsel could have provided a counternarrative of Andrus' later episodes in prison." *Id*. In sum, reasonable jurists can and do disagree that *Skipper* is merely an evidentiary rule. Counsel in a capital case must investigate evidence of a defendant's adjustment to incarceration.

The district court next erred by inventing a reason for why counsel failed to investigate and present this crucial prison-adjustment evidence. The lower court's speculation has no basis in the record. Neither a state court nor the district court held a hearing to discern why trial and post-conviction counsel failed to investigate and develop this claim. Without an evidentiary hearing, it is impossible to know.

The court said trial counsel presented evidence that Mr. Dorsey "was a good person who had a positive impact on peoples' lives and that his misconduct was largely attributable to substance abuse." ECF-104 at 27. The court then recognized that the evidence presented to the jury was "not exactly the same type as the evidence proffered here" during habeas proceedings. *Id.* From this, the court concluded that "it was reasonable for trial counsel to focus on

---

mitigation. Like Mr. Dorsey's attorneys, counsel in *Johnson* "pursued this strategy after what can only be described as an anemic and leaderless investigation." *Johnson*, 544 F.3d at 600. Ultimately, the state court "unreasonably concluded that Johnson's attorneys 'presented a meaningful concept of mitigation' without looking to the reasonableness of the investigation's scope." *Id.* at 602 (citation omitted).

Petitioner's good character outside of custody rather than on his good behavior and ability to adjust to incarceration without violence." *Id.*

To support this, the court cited – with a Cf. signal – to *Cole v. Roper*, 623 F.3d 1183, 1190 (8th Cir.2010). But, even in citing to it, the court noted in a parenthetical why that case does not apply to this situation: "(no deficiency on a similar claim under §2254 deference)." Mr. Dorsey's claim was defaulted in state court. Mr. Dorsey, however, has cause to overcome that procedural default because post-conviction counsel ineffectively failed to argue trial counsel's ineffectiveness. *Martinez v. Ryan.*

Reasonable jurists certainly disagree with the proposition that the proper lens through which to review a *Martinez*-cognizable claim is through §2254 deference to a state court judgment that <u>does not exist</u>. *Sigmon v. Stirling*, 956 F.3d 183, 191 (4th Cir.2020)("this highly deferential standard [from §2254(d)] does not apply to Sigmon's *Martinez* claims, which were not adjudicated on their merits in state court. ...In such cases, a federal court considers those claims *de novo*."); *Rodney v. Filson*, 916 F.3d 1254, 1262 (9th Cir.2019)(on remand, "[i]f the district court determines that Rodney's IAC claims are substantial and thus that the procedural default of the claims is excused under *Martinez*, then AEDPA deference will no longer apply and the claims will be subject to de novo review"); *Ryder ex rel. Ryder v. Warrior*, 810 F.3d 724, 747 (10th Cir.2016)("Because *Martinez* addressed only what constitutes 'a ground for relief,' it has no bearing on…[the] application of AEDPA deference to a state court's cause-and-prejudice analysis"), *cert. denied*, 137 S.Ct. 498 (2016); *Gray v. Zook*, 806 F.3d 783, 789 (4th Cir.2015)("because a petitioner raising a *Martinez* claim never presented the claim in state court, a federal court considers it de novo, rather than under AEDPA's deferential standard of review"), *cert. denied*, 137 S.Ct. 84 (2016).

While that error is enough reason to grant a COA, reasonable jurists would disagree for several reasons with the district court's conclusion that trial counsel reasonably decided to present evidence that friends and family believed him to be "a good person" instead of evidence that he would safely adapt to life in prison. Initially, clearly established federal law states that a decision about what strategy to pursue can only be made after a "thorough investigation of the defendant's background." *Williams*, 529 U.S. at 396.

In *Strickland*, the Court said

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Strickland v. Washington*, 466 U.S. 668, 690-91 (1984). The Court later made clear that abandoning a mitigation investigation "at an unreasonable juncture" makes "a fully informed decision with respect to sentencing strategy impossible." *Wiggins v. Smith*, 539 U.S. 510, 527-28 (2003).

Before counsel can reasonably adopt a theory of presenting "good person" evidence to the exclusion of prison-adjustment evidence,[3] such a decision can only be made after a "thorough investigation." In addition to the broad principle of requiring a thorough investigation, reasonable jurists certainly can (and do) disagree about the specific scenarios of

---

[3] Reasonable jurists might even disagree with a finding that a "good person" defense is a reasonable strategy for a mitigation presentation. *See Bemore v. Chappell*, *infra*, (the "'good guy' defense strategy" is "risk-fraught."). Because a decision to pursue this strategy can only be made after a reasonable investigation, which did not happen here, the court need not consider this question in this case.

whether the "good person" strategy obviates the need for a thorough investigation and of whether an unexplored prison-adjustment claim fails because counsel prematurely terminated that investigation.

For example, in *Bemore v. Chappell*, 788 F.3d 1151, 1174 (9th Cir.2015), *cert. denied*, 136 S.Ct. 1831 (2016), an expert told trial counsel the defendant suffered from several mental-health conditions and specifically recommended further testing to confirm a mental-health diagnosis. Because counsel believed this report conflicted with her planned "'good guy' defense strategy, she placed the report 'in the back of a file drawer'" and did not follow up on it. *Id.* The Ninth Circuit held that this amounted to deficient performance (and that the California court unreasonably concluded otherwise) because the "early decision to pursue a risk-fraught 'good guy' mitigation strategy did not satisfy [counsel's] duty first to unearth potentially mitigating mental health evidence." *Id.*

In *Wharton v. Vaughn*, the Third Circuit held counsel's investigation insufficient for failing to examine the defendant's prison records. "[A] defense attorney has a duty to obtain a capital defendant's prison records 'as part of the "obligation to conduct a thorough investigation of the defendant's background."'" *Id.*, 722 Fed.Appx. at 282 (quoting *Blystone v. Horn*, 664 F.3d 397, 422-23 (3d Cir.2011)(quoting *Williams*, 529 U.S. at 396)). Because of that duty, "if counsel has failed to conduct a reasonable investigation to *prepare* for sentencing, then he cannot possibly be said to have made a reasonable decision as to what to *present* at sentencing." *Id.* (quoting *Blystone*, 644 F.3d at 420 (emphasis original)). Even if counsel presented different evidence to the jury (such as "good person" evidence), it still would be unreasonable to fail to obtain and review the prison records. *Id.* at 280 ("If, for example, [trial counsel] simply neglected to seek out the prison records, his conduct could be deemed unreasonable regardless of

whether the records were particularly helpful or whether he presented other mitigating evidence to the jury.").

This is not a case where counsel presented the jury with a robust mitigation case. Instead, it is very similar to *Andrus*. In that case, "counsel nominally put on a case in mitigation in that counsel in fact called witnesses to the stand after the prosecution rested, the record leaves no doubt that counsel's investigation to support that case was an empty exercise." *Andrus*, 140 S.Ct. at 1882. Likewise, though Mr. Dorsey's counsel did present "good person" evidence, reasonable jurists certainly could find that *only* presenting this "risk-fraught" narrative was "an empty exercise." *See also Workman v. Superintendent, Albion, SCI*, 915 F.3d 928, 942 n.51 (3d Cir.2019)("A petitioner may rebut the suggestion that the challenged conduct reflected merely a tactical choice by showing that counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker").

Also, Mr. Dorsey's attorneys were not burdened with preparing for a defense in the guilt phase because their client had already pled guilty months earlier. They could focus all of their attention on preparing for the mitigation case. That same scenario played out in *Andrus*: counsel's failure to conduct a thorough mitigation investigation "is all the more alarming given that counsel's purported strategy was to concede guilt and focus on mitigation." *Andrus*, 140 S.Ct. at 1883. Reasonable jurists could find that Mr. Dorsey's counsel provided constitutionally deficient performance.

Next, the district court found Mr. Dorsey did not show prejudice by his counsels' failure to investigate and present this powerful mitigation evidence. Reasonable jurists certainly could disagree with that conclusion.

First, the district court justified its decision with another "Cf." citation to a case that analyzed the prejudice prong under AEDPA deference, which is not the situation for Mr. Dorsey's defaulted claim that is cognizable under *Martinez*. ECF-104 at 27 (citing *Skillicorn v. Luebbers*, 475 F.3d 965, 975 (8th Cir.2007)). Again, the district court itself flagged with a parenthetical that it was applying the incorrect standard: "(no prejudice on a similar claim under §2254 deference)." *Id.* As noted above, reasonable jurists do disagree that a claim in this posture should be viewed through AEDPA deference.

Second, *Skillicorn* is substantially distinguishable from Mr. Dorsey's case for one very important reason: the defendant's attorney actually undertook an investigation of the defendant's good behavior in jail and even presented evidence that the defendant "was a good, non-violent prisoner." *Skillicorn*, 475 F.3d at 975. The habeas court ruled against Skillicorn because the Missouri Supreme Court did not unreasonably find that "the proposed [new] evidence added little to the mitigating evidence actually presented." *Id.* In addition to *Skillicorn*, courts have easily found a lack of prejudice when trial counsel has presented some prison-adjustment evidence and habeas counsel then sought to present additional prison-adjustment evidence. *See, e.g.*, *Wharton v. Chappell*, 765 F.3d 953, 973 (9th Cir.2014)("Petitioner's argument fails for the simple reason that [trial counsel] did introduce evidence of his positive adjustment to prison"); *Hill v. Mitchell*, 400 F.3d 308, 330 (6th Cir.)("Counsel did not, as [the petitioner] contends, fail to put on any evidence of [Petitioner's] ability to adjust to prison life"), *cert. denied*, 546 U.S. 1039 (2005). While reasonable jurists might not disagree about the relative worth of cumulative prison-adjustment evidence, they would disagree with the district court here because *no evidence* of prison adjustment was presented to Mr. Dorsey's jury.[4]

---

[4]      When the District Court denied Mr. Dorsey's Rule 59(e) motion, it said that the

Third, reasonable jurists also could disagree with the district court's finding that Mr. Dorsey failed to show he had been prejudiced. As noted by the district court, trial counsel only presented "good person" evidence. Prison-adjustment evidence is substantively different. The *Skipper* Court itself noted the substantive importance of this type of testimony compared with testimony presented by family and friends and found it could have impacted at least one juror:

> The evidence petitioner was allowed to present on the issue of his conduct in jail was the sort of evidence that a jury naturally would tend to discount as self-serving. The testimony of more disinterested witnesses – and, in particular, of jailers who would have had no particular reason to be favorably predisposed toward one of their charges – would quite naturally be given much greater weight by the jury. Nor can we confidently conclude that credible evidence that petitioner was a good prisoner would have had no effect upon the jury's deliberations.

*Skipper*, 476 U.S. at 8. As this makes clear, reasonable jurists could find the "good person" type of evidence is substantively different than prison-adjustment evidence. Evidence suggesting friends and family found a defendant to be likeable around them can be easily discounted. *See id.* (this testimony would be discounted as "self-serving"). Evidence that tells a jury that a defendant, while in an unforgiving prison atmosphere, has demonstrated good behavior to his jailers and that provides expert opinion that this behavior is likely to continue if sentenced to life looks to the future with evidence from disinterested witnesses. *Id.* (this type of evidence "would quite naturally be given much greater weight by the jury"); *Cole v. Roper*, 623 F.3d 1183, 1200 (8th Cir.2010)(Bye, J., concurring/dissenting)("Given *Skipper*'s distinction between jailhouse behavior testimony directly from jailers, as opposed to similar character evidence from a capital defendant or his family members, the Missouri Supreme Court's decision that Cole's good

---

new evidence presented by Mr. Dorsey is "largely cumulative of the evidence already proffered." ECF-108 at 3. As noted in the succeeding paragraphs, the prison-adjustment evidence is substantively different than the backwards looking "good person" evidence presented at trial.

jailhouse behavior would have merely been cumulative of other evidence of Cole's good behavior is an unreasonable application of Supreme Court precedent"); *Davis v. State*, 87 So.3d 465, 472 (Miss.2012)(penalty phase testimony concerned only defendant's "employment history, military service, and nonviolent, generous character," at 475, and new prison-adjustment evidence was not cumulative; therefore, penalty phase relief was granted).

Perhaps because the *Skipper* Court made this so clear, a Westlaw search produced just a single opinion by any federal or state court in the entire country that discounted *Skipper* evidence because "good person" evidence was presented. That lonely case: the district court opinion in Mr. Dorsey's case. In other words, no jurist has embraced the lower court's reading of *Skipper* and reasonable jurists would disagree with the lower court's interpretation.

Furthermore, during deliberations, the jury asked several questions. In response, the trial court permitted them to have a copy of the report prepared by Mr. Dorsey's expert and photographs of the victims. ECF-29-2 at 146-148. The jury also asked if they could "do a secret ballot vote between us to determine the proper penalty before working through final instructions?" *Id.* at 148. Taken together, this suggests that the jury was weighing the mitigating and aggravating circumstances and there must have been some concern about peer pressure to want a secret ballot.

If the jury had also been told that Mr. Dorsey's conduct after the crime and in a controlled setting had been exemplary and that this likely would continue with future incarceration (which it has), a reasonable jurist could conclude that at least one juror – perhaps someone asking for a secret ballot – would have voted to spare Mr. Dorsey's life. *See Williams*, 529 U.S. at 398-99 (prison-adjustment evidence, when considered with all mitigation evidence,

created a reasonable probability of a different outcome). Reasonable jurists certainly could disagree with the district court that Mr. Dorsey was not prejudiced.

The district court also found Mr. Dorsey did not show cause and prejudice to excuse the procedural default of this claim because it found that the claim was insubstantial under *Martinez*. ECF-104 at 27. In reaching this conclusion, however, it necessarily decided the underlying question of whether trial counsel were ineffective. *See id.*; ECF-108 at 2-3 ("The Court concluded that that the default was not excused under *Martinez*…because the underlying claim of ineffective assistance of trial counsel was meritless and thus not a 'substantial' claim that should have been pressed in the state postconviction proceedings."). The district court then held that the standard suggested by Mr. Dorsey – the *Miller-El* standard for the issuance of a COA – was incorrect because "[t]hese are two different standards." ECF-108 at 3.

Reasonable jurists disagree with the lower court's analysis and its rejection of the COA standard. *Martinez*, 566 U.S. at 14 (in holding that petitioners must show that a claim has "some merit," the Supreme Court cited to *Miller-El*, which "describ[es] standards for certificates of appealability to issue"); *Brown v. Brown*, 847 F.3d 502, 515 (7th Cir.2017)(in applying the COA standard to a *Martinez* question, "[t]his threshold inquiry does not require full consideration" of the underlying claim), *cert. denied*, 138 S.Ct. 1547 (2018); *Hittson v. GDCP Warden*, 759 F.3d 1210, 1269 (11th Cir.2014)("we take the Court's reference to *Miller-El* to mean that it intended that lower courts apply the already-developed standard for issuing a COA"), *cert. denied*, 135 S.Ct. 2126 (2015); *Cox v. Horn*, 757 F.3d 113, 119 (3d Cir.2014)(applying COA standard), *cert. denied*, 575 U.S. 929 (2015); *Detrich v. Ryan*, 740 F.3d 1237, 1245 (9th Cir.2013)(citing *Miller-El* standard), *cert. denied*, 572 U.S. 1146 (2014); *Cook v. Ryan*, 688 F.3d 598, 610 n.13 (9th Cir.2012)(observing that *Martinez* used *Miller-El* as "generally analogous support"), *cert.*

*denied*, 567 U.S. 958 (2012); *see also Buck v. Davis*, 137 S.Ct. 759, 773 (2017)("The COA inquiry, we have emphasized, is not coextensive with a merits analysis. ...This threshold question should be decided without full consideration of the factual or legal bases adduced in support of the claims.")(citations omitted)).

Finally, the district court held that Mr. Dorsey's pre-decision request to supplement this claim with affidavits and a declaration would not be allowed because that evidence is hearsay. ECF-104 at 49. In this case, Mr. Dorsey presented an affidavit of an investigator who interviewed fourteen correctional officers, prison administrators, and law enforcement personnel who had interactions with Mr. Dorsey and who would offer evidence about his positive and incident-free adjustment to prison. ECF-100-2. Mr. Dorsey also presented a declaration by Dr. Mark Cunningham, a clinical psychologist, who provided a retrospective opinion about Mr. Dorsey's adaptability to incarceration that would have been available at the time of the trial. ECF-100-3. Reasonable jurists disagree with the proposition that it is inappropriate to use affidavits and declarations as support for why a hearing should be granted. *See Smith v. Baker*, 960 F.3d 522, 534 (9th Cir.2020)("The district court allowed Smith to submit the mental health declarations his lawyers obtained in 2007 and the court explicitly considered this extra-record evidence in its order dismissing Smith's *Martinez* claim").

There was no hearing held in the district court, though Mr. Dorsey requested one. ECF-25 at 389; ECF-86 at 50; ECF-100 at 8. These documents were offers of proof for what Mr. Dorsey intended to prove at an evidentiary hearing.

Furthermore, Habeas Rule 7 addresses "Expanding the Record." The Rule specifically allows that "[a]ffidavits may also be submitted and considered as part of the record." Habeas Rule 7(b). Habeas Rule 8 then directs the district court to consider the existing record and "any

materials submitted under Rule 7 to determine whether an evidentiary hearing is warranted." Habeas Rule 8(a). Reasonable jurists would disagree that affidavits are an inappropriate mechanism for a petitioner to use when attempting to expand the record.

Because reasonable jurists have disagreed with the district court on its holding concerning counsels' lack of investigation into and failure to present any evidence of positive prison adjustment, this Court should issue a COA to review this claim. *See Ramey v. Davis*, 942 F.3d 241, 254-58 (5th Cir.2019)(after the district court found the trial-counsel-ineffectiveness claim to not be cognizable despite *Martinez* and after it denied a COA, the Fifth Circuit granted a COA on the claim pursuant to *Miller-El*). As the Sixth Circuit said just a few weeks ago, "[o]f course, given the labyrinthine nature of habeas law in general, and *Martinez v. Ryan* in particular, Rogers 'has a long way to go' before we could rule in his favor. …But those realities alone are no reason to refrain from issuing a COA and at least giving the issue our full consideration, with the benefit of briefing and argument. This is especially so because a man's life is at stake." *Rogers v. Mays*, ___Fed.Appx.____, 2020 WL 2521304, at *3 (6th Cir.2020)(citation omitted).

This Court should grant a certificate of appealability.

### B. Mr. Dorsey Was Denied the Effective Assistance of Trial Counsel by Pleading Guilty on Advice of Counsel Without Any Consideration from the State Prior to Investigating a Partial Responsibility Defense of Diminished Capacity.

Reasonable jurists could disagree with the district court that the state court adjudication of this claim did not result in a decision that was contrary to, or an unreasonable application of, clearly established federal law. The Missouri Supreme Court held Mr. Dorsey was not denied the effective assistance of trial counsel where trial counsel did not investigate a mental-health

diminished-capacity defense before advising Mr. Dorsey to plead guilty to first-degree murder. Reasonable jurists could also disagree with the district court that the state court determination of facts relating to this claim was not unreasonable in light of the facts presented in the state court proceeding.

On advice of counsel, Mr. Dorsey pleaded guilty to two counts of first-degree murder and related offenses on March 10, 2008. There was no consideration from the State in exchange for his guilty pleas. Instead, voir dire commenced for a capital sentencing proceeding.

When Mr. Dorsey entered his guilty pleas, counsel had retained a clinical/forensic psychologist, Dr. Robert Smith, who initially met Mr. Dorsey and performed some testing on August 25, 2007. ECF-29-2 at 122. Dr. Smith requested additional records from trial counsel, which counsel provided in February 2008. ECF-25 at 112. Dr. Smith planned to return to evaluate Mr. Dorsey on March 8-9, 2008. However, a snowstorm prevented that. *Id.* at 163. Trial counsel had also retained a neuropsychologist to evaluate Mr. Dorsey for the presence of organic brain damage, though he concluded Mr. Dorsey had no discernable indicators of organicity. ECF-104 at 25. Neither expert was asked to opine on diminished capacity. Hence, when Mr. Dorsey pled guilty, neither counsel nor client had the information necessary to make an informed decision about whether or not to pursue a diminished-capacity defense.

Dr. Smith ultimately returned to Missouri to evaluate Mr. Dorsey on March 31, 2008, three weeks after Mr. Dorsey pled guilty. ECF-29-2 at 122. He prepared a report that found Mr. Dorsey suffered from major depressive disorder and from alcohol and cocaine dependence. ECF-29-2 at 124. He testified to these diagnoses in Mr. Dorsey's sentencing proceeding. *Id.* Indeed, he testified that while the dual diagnoses didn't cause Mr. Dorsey to commit the murders, they contributed to his commission of those offenses. ECF-29-2 at 125. During cross-

examination, Dr. Smith admitted that Mr. Dorsey understood right from wrong, but that his capacity was significantly impaired both by his depression and his alcohol and drug use at the time of the offenses. ECF-29-2 at 131.

In response to Dr. Smith's opinion that Mr. Dorsey's capacity was diminished by his mental health pathology, the prosecutor said "[t]hat term has a legal meaning, Doctor, and I don't think you want to say that." ECF-29-2 at 131. The defense objected. *Id.* That objection was overruled and the prosecutor asked whether Dr. Smith was saying that "under the influence of drugs and alcohol, [Mr. Dorsey's] ability to reason are (sic) impaired….Is that correct?" Dr. Smith responded, "That is correct." *Id.* The prosecutor then asked, "But he is not – in Missouri, if you say someone has diminished capacity, you are saying they are not responsible for their actions." The defense objected, arguing that this was an inaccurate statement of the law and without foundation. *Id.* The trial court asked counsel to approach the bench and informed both parties that "[a]s I understand diminished capacity in Missouri, it means that that takes away the mental status of the crime. He admitted to the mental state of the crime, correct?" Defense counsel Slusher responded, "Yes, sir." The trial court overruled the objection. *Id.*

This exchange, and Dr. Smith's testimony, presented two problems, both of which were exhausted in state court and raised in the federal habeas corpus petition. First, it established that had Dr. Smith concluded his investigation prior to Mr. Dorsey pleading guilty, there was a viable partial defense to the element of deliberation in first-degree murder, the foundation for which was not developed nor shared with Mr. Dorsey prior to his entry of guilty pleas. Hence, neither counsel nor Mr. Dorsey were able to make a reasoned decision about trial strategy. Second, it misled the jury about the evidentiary support for the statutory mitigating circumstance that existed at the time of the offense: the defendant's capacity to appreciate the criminality of his

conduct or to conform his conduct to the requirements of law was substantially impaired. Mo.R.S. §565.032(3)(6).

1.      Diminished-Capacity Defense.

The district court's analysis of this claim is debatable among jurists of reason. The district court fully relied upon the Missouri state courts' adjudication of this claim, which resulted in a decision that was contrary to, or an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court, and resulted in a decision that was based on an unreasonable determination of facts, in light of the evidence presented in the state court proceeding.

The district court concluded that trial counsel considered pursuing a diminished capacity defense, but decided not to because the overwhelming weight of the evidence was against it. ECF-104 at 10. In fact, the evidence adduced at the state court proceeding does not support this conclusion.

The Missouri Supreme Court noted that trial counsel Slusher hired Dr. Smith "to determine, if at the time of the offense, there are any diagnosable disorders that are significant to the case." *Dorsey v. State*, 448 S.W.3d 276, 289 (Mo.2014). Yet, Slusher advised Mr. Dorsey to plead guilty before Dr. Smith concluded his evaluation and provided the results to counsel. Doing so at least partially negated the function the Missouri Supreme Court found for counsel's hiring Dr. Smith.

The Missouri Supreme Court also found that trial counsel had two conflicting recollections of his thought processes prior to advising Mr. Dorsey to plead guilty to the charges.

> Mr. Slusher testified that he did not remember seriously considering doing the diminished capacity defense but later testified that he thought he did consider such a defense prior to Mr. Dorsey pleading guilty. Mr. Slusher testified that he assumed Dr. Smith's evaluation would cover diminished capacity and that he did

not believe that Mr. Dorsey's case presented a type of mental disease or defect to provide a diminished capacity defense. Mr. Slusher considered the evidence of guilt in this case to be overwhelming and did not view the facts to be favorable to making a diminished capacity argument. He believed that pleading guilty and, thereby, accepting responsibility, was the best chance Mr. Dorsey had avoiding the death penalty. Accordingly, he advised Mr. Dorsey to plead guilty.

*Dorsey v. State*, at 290.

The Missouri Supreme Court's above-quoted findings are muddled. They present two distinct versions of what transpired: first, Mr. Slusher did not remember seriously considering doing the diminished capacity defense, and second, he did consider such a defense and rejected it because he did not believe Mr. Dorsey's case presented a type of mental disease or defect to provide a diminished capacity defense. Both cannot be true. While reasonable in some circumstances for a court to hear two conflicting versions or accounts of what transpired and choose to accept one over the other, the Missouri Supreme Court's decision to credit account number two above was not reasonable in light of the evidence presented. Additionally, the Missouri Supreme Court's decision ignores the dictates of *Strickland*.

First, the rationale articulated by the Missouri Supreme Court to justify this strategy is not supported by logic. That court concluded trial counsel decided pleading guilty was necessary to accept responsibility. But the diminished capacity defense is premised on the assumption that the accused did indeed commit the acts with which he is charged without the requisite state of mind at the time he committed those acts. The diminished capacity defense, also known as the "partial responsibility" doctrine, *State v. Anderson*, 515 S.W.2d 534 (Mo.1974), does accept responsibility for the crimes charged.

Second, the very first command of *Strickland* is to evaluate counsel's strategic decisions within the context of the duty of loyalty to the client. A strategy driven by any other motive cannot be credited. *Strickland*, 466 U.S. at 688. Here, as noted above, trial counsel were

retained with flat fees. Hence, it was to their financial advantage for Mr. Dorsey to plead guilty and for them to focus exclusively on a capital-sentencing proceeding. Counsel's strategy must be viewed through that prism, which the Missouri Supreme Court did not do.

Third, counsel's initial response when asked about his strategy at the state post-conviction hearing was that he did not remember seriously considering the diminished capacity defense. He did not articulate a second rationale until it was explored further on cross-examination. This presents a situation analogous to a recantation. Courts are loath to accept recanted testimony, generally accepting as true the initial testimony provided by a witness. *United States v. Earles*, 983 F.Supp. 1236, 1239 (N.D.Iowa 1997)(quoting *United States v. Provost*, 969 F.2d 617, 620 (8th Cir.1992)("Skepticism greets any recantation of testimony by a witness in a criminal case, because where a witness later recants testimony given at trial, 'the witness is either lying now, was lying then, or lied both times.'")).

Additionally, the Missouri Supreme Court's analysis attributes to trial counsel the strategic decision to reject a diminished-capacity or partial-responsibility defense because at least part of the factual underpinning of the defense would have included Mr. Dorsey's extreme intoxication at the time of the offense. The theory is that counsel knew that voluntary intoxication is not allowed to establish a basis for a diminished-capacity or partial-responsibility defense. Mo.R.S. §562.076. This theory is flawed, and an unreasonable determination of facts in light of the evidence presented in state court. It assumes trial counsel knew what Dr. Smith's evaluation would yield before he concluded it and communicated the results to counsel. It is also based on an erroneous legal assumption. Missouri law doesn't preclude evidence of voluntary intoxication per se, but rather holds that voluntary intoxication cannot, by itself, provide the basis for a diminished-capacity defense. *State v. Erwin*, 848 S.W.2d 476, 480 (Mo.1993). The

evidence of Mr. Dorsey's extreme intoxication at the time of the offenses would have been admissible to corroborate Dr. Smith's diagnosis of Mr. Dorsey as having a major depressive disorder, since Dr. Smith testified that people with major depressive disorder commonly self-medicate with alcohol and drugs. ECF-29-2 at 125 ("most of these individuals, one of the ways they cope with their depression is they use alcohol and drugs as a temporary escape"). Finally, the Missouri Supreme Court wholly ignored Dr. Smith's testimony about Mr. Dorsey's insomnia leading up to the offenses, another vital component of why Dr. Smith opined that Mr. Dorsey's capacity was impaired at the time of the offenses. ECF-92-1 at 125, 127-128 ("Given that Brian had been up pretty much for almost three days….").

To establish prejudice, Mr. Dorsey presented at the state post-conviction hearing the testimony of Dr. A.E. Daniels, a psychiatrist who corroborated Dr. Smith's dual diagnoses of major depressive disorder and alcohol and drug dependency. Dr. Daniels also confirmed that in his opinion, Mr. Dorsey's capacity to coolly deliberate was diminished at the time of the offenses. Mr. Dorsey also presented additional testimony of Dr. Smith, who interviewed Mr. Dorsey's parents and other relatives after the sentencing and discovered that Mr. Dorsey's mother also suffered from major depressive disorder, and other members of his extended family had alcohol and drug dependency issues. He opined this made Mr. Dorsey genetically predisposed to major depressive disorder and drug and alcohol dependency. The Missouri Supreme Court gave this additional evidence no weight. *Dorsey v. State*, at 291.

Rather, the Missouri Supreme Court focused on the evidence in the record that supported a finding that Mr. Dorsey did deliberate the killings. By focusing only on the trial evidence to the exclusion of the newly-presented evidence, the court reached a decision that was contrary to, or an unreasonable application of, clearly established federal law. That there was evidence from

which a jury could find that Mr. Dorsey coolly reflected on the killings misses the point. In the absence of any such evidence, it would have been error for Mr. Dorsey's guilty pleas to be accepted at all. The question for the Missouri courts was whether trial counsel acted unreasonably in moving forward with those guilty pleas prior to obtaining the results of Dr. Smith's evaluation to determine whether evidence of a diminished-capacity partial-responsibility defense existed. Reasonable jurists can debate whether the district court failed to consider that "the *Strickland* inquiry requires precisely the type of probing and fact-specific analysis that the state...court failed to undertake below." *Sears*, 561 U.S. at 955.

Had trial counsel waited until Dr. Smith concluded his evaluation, he could have discussed with Mr. Dorsey the option of pleading guilty to two counts of first-degree murder versus pleading not guilty to first-degree murder and going to trial to try to secure convictions on the lesser-included offenses of second-degree murder. Presenting this option to Mr. Dorsey would have kept to trial counsel's strategy of having him accept responsibility for his actions, yet without admitting to the state of mind that he could not and did not have, commission after cool deliberation, and which rendered him eligible for death sentences. Mr. Dorsey was never presented with that option. Had it been presented to him, he would not have pleaded guilty.

In light of all this, the district court's application of 28 U.S.C. §2254(d) is certainly debatable among jurists of reason. *See Jacobs v. Horn*, 395 F.3d 92 (3d Cir.2005)(counsel ineffective for failure adequately to develop and present a diminished-capacity defense); *Mauldin v. Wainwright*, 723 F.2d 799 (11th Cir.1984)(ineffective assistance in failing adequately to develop and present insanity defense); *Beavers v. Balkrom*, 636 F.2d 114 (5th Cir.1981)(same); *see also Mathenia v. Delo*, 99 F.3d 1476, 1483-1484 (8th Cir.1996)(Bright, J., dissenting).

2.      Penalty Phase Consideration of Impaired Capacity Mitigating Circumstance.

Finally, due to the off-the-record colloquy near the end of re-cross examination at which the trial court overruled the defense's objection to the prosecutor's statement to Dr. Smith that "diminished capacity" equated with an accused not being responsible for his actions, Mr. Dorsey's jury was misled that it could not consider Dr. Smith's testimony in support of the statutory mitigating circumstance that the defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired. Mo.R.S. §565.032(3)(6). This violated *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989)("evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse.")(citations omitted; overruled on other grounds); *Lockett v. Ohio*, 438 U.S. 586 (1978).

Reasonable jurists could debate whether this occurred and whether this had a substantial and injurious effect or influence in determining the jury's verdict. *O'Neal v. McAninch*, 513 U.S. 432 (1995). Indeed, in the midst of penalty-phase deliberations, the jury asked to be provided Mr. Dorsey's and psychologist Dr. Smith's testimony. ECF-29-2 at 146. This jury was wrestling with the appropriate sentence to be imposed, and where the instructions could be understood to prohibit their consideration of the defendant's impaired capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law, this was prejudicial.

This Court should grant a certificate of appealability.

**C.** **The jury was not instructed and failed to find unanimously and beyond a reasonable doubt as required under the Sixth and Fourteenth Amendments and *Hurst v. Florida* that the mitigating circumstances did not outweigh the aggravating circumstances.**

Reasonable jurists could disagree with the district court that this issue was procedurally defaulted; and that the Missouri Supreme Court's decision did not constitute an unreasonable application of federal law.

Regarding procedural default, the district court found that, because the Missouri Supreme Court denied Mr. Dorsey's motion to recall the mandate and subsequent state habeas petition in unexplained orders, *Ylst v. Nunnemaker*, 501 U.S. 797 (1991), required it to "look through" to the last reasoned state court decision, which, in the district court's view, was the Missouri Supreme Court's decision in 2010 on direct appeal, in which a similar issue was raised under *Ring v. Arizona*, 536 U.S. 584 (2002), and reviewed for plain error. ECF-104 at 44-45 (citing *State v. Dorsey*, 318 S.W.3d at 652-53). The district court concluded the Missouri Supreme Court's plain-error review on direct appeal meant that, when the claim was presented in the federal habeas petition, it was procedurally barred. ECF-104 at 44. The district court's decision is debatable among jurists of reason.

The claim initially raised in Mr. Dorsey's motion to recall the mandate, and then subsequently in his Rule 91 state habeas petition, was based on the intervening decision in *Hurst v. Florida*, 136 S.Ct. 616 (2016), and thus was a claim that did not exist at the time of his direct appeal *six years earlier*. Under these circumstances, the presumption under *Ylst* does not apply to the Missouri Supreme Court's unexplained decisions denying Mr. Dorsey's motion to recall the mandate and his subsequent state habeas corpus petition, and the district court's decision to "look through" to the Missouri Supreme Court's 2010 direct-appeal opinion is therefore eminently debatable, when the federal claim Mr. Dorsey raised in the motion to recall the

mandate and subsequent state habeas corpus petition – a federal claim under *Hurst v. Florida* – did not exist at the time of that state-court decision. *Cf. Ylst*, 501 U.S. at 803 (applying presumption that, where there has been one reasoned state judgment rejecting federal claim, later unexplained orders rejecting *same* claim are presumed to rest upon *same* ground).

Indeed, the record surrounding the motion to recall the mandate and state habeas corpus petition indicates that the Missouri Supreme Court's rejection of Mr. Dorsey's federal claim under *Hurst* was rejected on federal law, not on state law, grounds. Mr. Dorsey first filed his federal claim under *Hurst* through the appropriate vehicle of a motion to recall the mandate – after obtaining a *Rhines* stay from the previously-assigned federal judge in order to exhaust his claim, ECF-55 at 2) – contending that the decision of the Missouri Supreme Court rejecting his similar federal claim under *Ring* directly conflicted with the Supreme Court's decision in *Hurst*. Mr. Dorsey argued specifically that, "[u]nlike *Ring*, which was limited to the jury trial right (*see* 536 U.S. at 588), *Hurst* went further by specifying that if any finding of fact is necessary as a pre-condition to a death sentence, the Sixth and Fourteenth Amendments require that finding to be made by a jury beyond a reasonable doubt." MRM at 7. The Missouri Supreme Court issued an order requesting the State to respond. And, while the district court correctly noted that the Missouri Supreme Court's order directing a response was not "limited to the merits" (ECF-104 at 46; ECF-108 at 4), the extensive briefing, including the State's briefing in opposition, *was* addressed to the merits. While the State argued that the motion to recall the mandate was "procedurally improper" and "not appropriate," the State's argument was not addressed to any issue of plain error review or procedural default; rather, the State argued that the Missouri Supreme Court's decision *on the merits* did not conflict with *Hurst* because *Hurst* only "analyzes Florida's statutory scheme." State's Suggestions in Reply to MRM at 2. The remainder of the

State's argument was that *Hurst* essentially "applied" *Ring* and did not "expand" it, or that Missouri's scheme was different than Florida's. *Id.* at 2-9. Over two months after Mr. Dorsey filed his motion to recall the mandate, the Missouri Supreme Court overruled the motion without prejudice to filing a petition for writ of habeas corpus. Mr. Dorsey did so soon thereafter, and, forty-one days later, the Missouri Supreme Court denied the petition in a one-sentence order. Between the time of filing the motion to recall the mandate and the denial of the state petition for writ of habeas corpus, Mr. Dorsey's *Hurst* claim was before the Missouri Supreme Court for over four months. This provides "strong evidence" that the Missouri Supreme Court reached the merits of Mr. Dorsey's new federal claim under *Hurst* in denying the claim, and contradicts the district court's assertion, with no basis in the record, that such evidence was lacking.

Under these circumstances, the *Ylst* presumption does not apply. *See Ylst*, 501 U.S. at 804. The district court's reliance on *Byrd v. Delo*, 942 F.2d 1226 (8th Cir.1991), and *Oxford v. Delo*, 59 F.3d 741 (8th Cir.1995)(ECF-104 at 45) is misplaced. *Byrd* did not involve an intervening Supreme Court decision, the Missouri Supreme Court denied the state habeas corpus petition the same day it was filed, and, upon request of the State, the Missouri Supreme Court explicitly stated three days after its denial that a state procedural ground was the basis of the denial. *Byrd*, 942 F.2d at 1229. Nor did *Oxford* involve an intervening Supreme Court decision. Moreover, the Missouri Supreme Court had explicitly stated that Oxford's claims were procedurally defaulted then and in the future. *Oxford*, 59 F.3d at 741.

On the merits, the district court conceded that the issue is debatable among reasonable jurists. The district court relied on *State v. Wood*, 580 S.W.3d 566 (Mo.2019), for the proposition that the result of the jury's weighing of aggravating and mitigating circumstances is not a factual finding that must be made unanimously and beyond a reasonable doubt. However, the district

court admitted that *Wood* was not "dispositive[]," and recognized that the United States Supreme Court had already advised that a state's characterization of a jury decision as something other than a "finding of fact" does not settle the question; rather, it is for the federal court to make the determination of whether the jury's finding requires the protections of the Sixth and Fourteenth Amendments. ECF-104 at 48 (citing *Ring*, 536 U.S. at 602).

Yet the district court did not conduct any independent analysis of the required jury decisionmaking in weighing aggravating and mitigating circumstances to determine whether the jury's finding in that regard triggers the constitutional protections of unanimity and proof beyond a reasonable doubt undergirding the right to a jury trial under the Sixth and Fourteenth Amendments. Instead, the district court simply noted that there is a difference of opinion among a variety of state and federal courts, and concluded this establishes that the Missouri Supreme Court's decision not to require those constitutional protections was not unreasonable. ECF-104 at 48.

Indeed, *Hurst* is not merely a restatement of *Ring*, as the Delaware Supreme Court recognized in *Delaware v. Rauf*, 145 A.2d 430, 434 (Del.2016). Rather, the Supreme Court in *Hurst* made clear that a jury must find *each fact necessary* to impose a sentence of death, and that, where a statutory scheme, like Missouri's (*see* Mo.Rev.Stat. §565.030.4), requires the jury to make a finding as to the relative weight of aggravating and mitigating circumstance before a sentence of death can be imposed, that finding must be made by a jury, unanimously and beyond a reasonable doubt. *Hurst*, 136 S.Ct. at 619 ("The Sixth Amendment requires a jury...to find *each fact necessary* to impose a sentence of death"); *id*. at 621 ("The Sixth Amendment provides: 'In all criminal prosecutions, the accused shall enjoy the right to a speedy trial, by an impartial jury...' This right, in conjunction with the Due Process Clause, requires that each element of a

crime be proved to a jury beyond a reasonable doubt" (citing *Alleyne v. United States*, 570 U.S. 99, 104 (2013))); *Apprendi v. New Jersey*, 530 U.S. 466, 494 (2000)(any finding that increases the maximum punishment beyond that established by a jury finding of guilt alone must be submitted to a jury and proved beyond a reasonable doubt); *see also In re Winship*, 397 U.S. 358, 364 (1970); *Ramos v. Louisiana*, 140 S.Ct. 1390 (2020)(right to jury trial under Sixth and Fourteenth Amendments requires unanimous verdict for serious offenses).

Because reasonable jurists could disagree with the district court on this issue, a certificate of appealability should issue.

## IV.    <u>Conclusion.</u>

As described above, Mr. Dorsey has made a substantial showing of the denial of a constitution right, and reasonable jurists could debate (or agree that) the Petition for Writ of Habeas Corpus should have been resolved differently.  Accordingly, Petitioner seeks a certificate of appealability and issuance of a briefing schedule on the merits.

Respectfully submitted,

/s/ **Marshall L. Dayan**
Marshall L. Dayan
Assistant Federal Public Defender

/s/ **Kirk J. Henderson**
Kirk J. Henderson
Assistant Federal Public Defender

/s/ **Rebecca Woodman**
Rebecca Woodman

## CERTIFICATE OF SERVICE

I hereby certify that the following is a filing user and will be served electronically by the

Notice of Docketing Activity:

> Gregory M. Goodwin
> Assistant Attorney General
> Office of the Attorney General
> P.O. Box 899
> Jefferson City, MO  65102
>
> **/s/ Marshall Dayan**
> Assistant Federal Public Defender

Dated: July 30, 2020